IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| EDMUND AWAH, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 8:21-cv-00938-PX |
| MANSFIELD KASEMAN HEALTH CLINIC, *et al.*, | * | |
| Defendants. | * | |

***

## MEMORANDUM OPINION

This action relates to healthcare services that Plaintiff Edmund Awah ("Awah") received from two different providers, Mansfield Kaseman Health Clinic ("Mansfield Kaseman" or the "clinic") and Roosha Farnoosh, DMD ("Dr. Farnoosh"). As defendants to this lawsuit, Awah has named Mansfield Kaseman, three of Mansfield Kaseman's employees—Deanna Melara ("Melara"), Carmen Lezama ("Lezama"), and Leslie Boylan ("Boylan")—and Dr. Farnoosh. Presently pending before the Court are two motions to dismiss, one jointly filed on behalf of Mansfield Kaseman and its employees (collectively, the "Clinic Defendants") (ECF No. 16), and the other filed by Dr. Farnoosh (ECF No. 25). Awah timely responded to the former, but he has not responded to the latter. The Court finds no hearing necessary to resolve the motions. *See* D. Md. Loc. R. 105.6. For the following reasons, the Clinic Defendants' joint motion to dismiss is GRANTED in part and DENIED in part, and Dr. Farnoosh's motion is likewise GRANTED in part and DENIED in part.

## I.    BACKGROUND

Awah is a 68-year-old African American man living in Montgomery County, Maryland. *See* ECF No. 1 ¶ 5. Awah was a patient of Mansfield Kaseman, a clinic that offers medical care

to low-income residents of Montgomery County. *Id.* ¶¶ 21, 24. Melara is the clinic's patient referral coordinator, Lezama is one of the clinic's managers, and Boylan is a nurse practitioner at the clinic. *Id.* ¶¶ 17–19.

Awah separately received dental treatment from Dr. Farnoosh. ECF No. 1 ¶¶ 20, 52–54. Dr. Farnoosh, a dentist licensed to practice in the state of Maryland, works for the "Department of Health and Human Services Dental Program." *Id.* ¶ 20. Awah was referred to Dr. Farnoosh for dental services, though it is unclear by whom. *Id.* ¶¶ 52–53. According to Awah, each Defendant has violated his rights under state and federal law in myriad ways. The Complaint describes Awah's engagement with each of the Defendants as follows.

### A.    Mansfield Kaseman

For the three years that he received medical care at Mansfield Kaseman, Awah sincerely believes he has endured all manner of disparate treatment on account of his race. ECF No. 1 ¶¶ 28–30, 36, 38; ECF No. 18 at 3. As a black man, Awah stands out among the majority of clinic staff and patients who present as Latinx. *See, e.g.*, ECF No. 1 ¶¶ 6, 24, 28, 29. Awah maintains from the outset that his race presented significant barriers to the receipt of medical care on par with that of the Latinx patients, and he chronicles several instances of such alleged discrimination.

As a new patient, Awah had to submit paperwork verifying his residence, income, and assets so that the clinic could determine if he qualified for its services. ECF No. 1 ¶ 24. Although Awah completed the necessary paperwork, Defendant Melara "combatively confronted and harassed" him about his failure to do so. *Id.* ¶¶ 24–25. By contrast, Latinx patients never experienced similar harassment. *Id.* ¶ 28. Eventually, Lezama, the clinic's manager, became involved in the paperwork dispute. *Id.* ¶ 31. Lezama treated Awah similarly and, on one

occasion, threatened to cancel Awah's appointment with a physician.  *Id.*  The Complaint further alleges that contrary to Latinx patients, Awah's appointments would take four times as long to complete.  *See id.* ¶ 36.  Awah attributes these delays to racial animus against him and preferential treatment to members of the Latinx community.

Awah also perceives racially motivated denial of referrals for specialist care. Customarily, when the clinic cannot provide necessary specialized medical care, it will refer a patient to outside specialists.  ECF No. 1 ¶ 38.  But Defendants Melara and Lezama refused to refer Awah to many of the specialists that he wished to see.[1]  *Id.* ¶¶ 38–39.  By contrast, Latinx patients were always referred to specialists when necessary.  *Id.* ¶ 39.  As to a particular nephrology consult, Awah states he received a referral, but ultimately it was not for a nephrologist, but rather "another Latina woman."  *Id.* ¶ 43.

Relatedly, Awah accuses Melara and Lezama of sabotaging his attempt to obtain a medically necessary colonoscopy.  ECF No. 1 ¶¶ 44–47.  Clinic patients scheduled for a colonoscopy needed first to attend an "awareness class" during which a Mansfield Kaseman nurse would explain "the expectations and outcomes of the procedure."  *Id.* ¶ 45.  Awah, unlike Latinx patients scheduled for the same procedure, was never given the details of such a class.  *Id.* Consequently, Awah was unable to attend the class and have the colonoscopy.  *Id.* ¶ 46.

Awah also questions Mansfield Kaseman's privacy protocols.  The Complaint takes issue with Defendant Lezama having some non-specific contact with the Social Security Administration about Awah.  ECF No. 1 ¶ 78.  Further, the Complaint avers that the Clinic Defendants invaded Awah's privacy by providing at one of the medical visits a "live feed of a creepy looking man" (a Spanish interpreter) who made nonspecific "racist gestures" and

---

[1] Awah explains that he sought the following referrals: "colonoscopy, vision (ophthalmologist), dental, kidney scan specialists, kidney specialist (nephrologist), urology and sleep study."  ECF No. 1 ¶ 39.

observed Awah's visit.  *Id.* ¶¶ 48–50.

Awah also had difficulties obtaining his medical records upon request.  ECF No. 1 ¶ 37.

Specifically, Defendant Melara's refusal to transmit necessary records to another medical

facility, Awah maintains, violated his "rights to his own medical records."  *Id.* ¶ 80.

Additionally, Awah had to incur expenses that Latinx patients did not.  Awah, for instance, was

once charged "twice the amount charged to Latino patients."  *Id.* ¶ 40.  Melara also falsely told

him that no funding was available for an emergency eye surgery that he needed after sustaining

injuries during a stabbing.  *Id.* ¶ 41.  This persistent discriminatory conduct has caused Awah

"mental distress, emotional trauma, embarrassment, humiliation, and lost or jeopardized present

or future financial opportunities."  *Id.* ¶ 84.

### B.      Dr. Farnoosh

Awah first saw Dr. Farnoosh on March 10, 2021 for pain in two molars.  ECF No. 1 ¶ 53.

After an examination and x-rays, Dr. Farnoosh told Awah that one of his teeth needed to be

pulled.  *Id.* ¶ 54.  Initially, Dr. Farnoosh planned to pull the tooth at the first visit; however, after

learning that Awah had not eaten breakfast, Dr. Farnoosh decided against the procedure.  *Id.*

¶¶ 55–56.  Dr. Farnoosh rescheduled the extraction for six days later.  *Id.* ¶ 56.  Awah later

learned that dental patients should not eat before a tooth extraction, advice that was contrary to

Dr. Farnoosh's representations.  *Id.*  Still, Awah returned to Dr. Farnoosh on March 16th to have

his tooth pulled.  *Id.* ¶ 59.  Ultimately, Dr. Farnoosh did not perform the procedure at the second

visit because Awah's blood pressure had been elevated and his medical chart revealed a history

of other health complications.  *Id.* ¶¶ 59–61.  The Complaint avers, in conclusory fashion, that

Dr. Farnoosh manipulated the blood pressure machine as part of a conspiracy with the Clinic

Defendants to discriminate against him on the basis of his race.  *See id.* ¶ 62.  As a result of the

"conspiracy," Awah left the appointment in excruciating pain, which led to his eventual addiction to painkillers. *Id.* ¶ 87. Awah maintains that Dr. Farnoosh's substandard care was motivated by discriminatory animus. *Id.* ¶ 63.

Dissatisfied with the medical and dental treatment he received, Awah filed a nine-count Complaint alleging race discrimination under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 1983, and 42 U.S.C. § 1981; violations of the Privacy Act of 1974 and Freedom of Information Act; and companion conspiracy and state law claims against all Defendants. *See generally* ECF No. 1. Awah also pursues a medical malpractice claim against Dr. Farnoosh only, which Dr. Farnoosh opposes. *See* ECF No. 1 ¶ 90; ECF No. 25-1 at 24–26. The Clinic Defendants moved jointly to dismiss the Complaint on several grounds. ECF No. 16. Dr. Farnoosh essentially joined the motion. ECF No. 25-1 at 1 n.1. Awah responded to the Clinic Defendants' motion on August 18, 2021. ECF No. 18. The Court also granted Awah's requested additional time to respond separately to Dr. Farnoosh's motion (ECF No. 31), but Awah has not done so. The motions are now ready for resolution.

## II.    STANDARD OF REVIEW

A motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). A complaint need only satisfy the standard of Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration in original)

(internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555, 557).

In ruling on a motion to dismiss, a plaintiff's well-pleaded allegations are accepted as true and viewed in the light most favorable to him.  *Twombly*, 550 U.S. at 555.  Factual allegations, however, "must be enough to raise a right to relief above a speculative level."  *Id.*  "'[N]aked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief."  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (alteration in original) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557).  Although pro se pleadings are construed liberally to allow for the development of a potentially meritorious case, courts cannot ignore a clear failure to allege facts setting forth a cognizable claim.  *Compare Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (explaining that pro se complaints are not held to the same pleading standard as those prepared by lawyers) *with Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990) ("The 'special judicial solicitude' with which a district court should view such pro se complaints does not transform the court into an advocate.").

## III.    ANALYSIS

The Court turns first to the Complaint's federal claims and next to the claims brought under Maryland statutory and common law.

### A.    Title VI (Count I)

Count one alleges that all Defendants discriminated against Awah on account of his race and in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.  Title VI "prohibits discrimination on the basis of race, color, or national origin by recipients of federal financial assistance."  *Smith v. McCarthy*, No. ELH-20-419, 2021 WL 4034193, at *20 (D. Md. Sept. 3, 2021).  "To state a claim under Title VI, the Plaintiff must plausibly allege that

Defendant received federal financial assistance and engaged in intentional racial discrimination." *Glenn v. Wells Fargo Bank, N.A.*, No. PX 15-3058, 2017 WL 371956, at *15 (D. Md. Jan. 26, 2017), *aff'd*, 710 F. App'x 574 (4th Cir. 2017). Additionally, as Defendants correctly note, courts have long recognized that Title VI's prohibitions traditionally apply to entities—not individuals. *See, e.g.*, *Farmer v. Ramsay*, 41 F. Supp. 2d 587, 592 (D. Md. 1999) ("Title VI was designed to prohibit discrimination by organizations receiving federal assistance."); *Pavlovic v. Univ. of Md. Balt. Cnty.*, No. MJG-13-983, 2013 WL 4775530, at *4 n.4 (D. Md. Sept. 4, 2013) (collecting cases); *Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 521 (3d Cir. 2011) (unpublished opinion) ("Individual liability may not be asserted under Title VI.").

The Court begins with the claim against Mansfield Kaseman. The Complaint avers that the clinic received federal funds through a Paycheck Protection Program ("PPP") loan[2] of $93,400.00 and that its employees consistently and intentionally treated Awah adversely on account of his race. *See* ECF No. 1 ¶¶ 8, 10; ECF No. 18 at 2–3. Mansfield Kaseman urges the Court to dismiss the claim for three reasons: (1) Awah has not demonstrated any "nexus between the federal coronavirus funding and the alleged discrimination at issue," (2) Awah was not the "intended beneficiary of the federally funded program," and (3) Awah did not put the clinic on sufficient notice of the alleged discriminatory conduct. ECF No. 16-1 at 8–11. The Court addresses each argument separately.

First, as to whether the Complaint avers a sufficient nexus between the PPP funding and allegations of discrimination, in the context of providing medical treatment, Title VI prohibits a

---

[2] The Paycheck Protection Program was created as part of the Coronavirus Aid, Relief, and Economic Security Act (commonly known as the "CARES Act") in response to the COVID-19 pandemic. *See Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*, 990 F.3d 217, 224 (2d Cir. 2021). Under the program, employers could obtain loans from the Small Business Administration that would later be forgiven if the employer used the funds for "payroll costs . . ., mortgage interest, rent, or utilities." *See id.*

medical facility which receives federal funds from engaging in intentional discrimination.  *See Ratliff v. Wake Forest Baptist Med. Ctr.*, No. 13-991, 2014 WL 197809, at *2 (M.D.N.C. Jan. 14, 2014) ("Title VI affords a cause of action to a patient who alleges racial discrimination in the care given by a medical facility that accepts *any* federal funds.") (emphasis added); *see also Carnell Const. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 716 (4th Cir. 2014) (collecting cases where receipt of federal funds subjected non-government entities to Title VI's prohibitions).  Attempting to argue the contrary, Mansfield Kaseman presses that the claim fails as did the claim in *Rogers v. Board of Education*, 859 F. Supp. 2d 742 (D. Md. 2012).  But *Rogers* bears not at all on this case.  There, the plaintiffs, former employees of defendant Prince George's County Board of Education, sued under Title VI for intentional discrimination in connection with their employment.  The critical issue for resolution in *Rogers* was whether Title VI requires a nexus between the federal funding and their employment as applied to a Title VI *employment discrimination* claim.  *See id.* at 744.

Undergirding the *Rogers* analysis, significantly, had been the interplay between Title VI, which reaches intentional discrimination against employees if federal funding provided the employment, and Title VII, which prohibits employment discrimination more broadly and without regard to receipt of federal funding.  *See Rogers*, 859 F. Supp. 3d at 747–51; *see also Middlebrooks v. Godwin Corp.*, 722 F. Supp. 2d 82, 93 (D.D.C. 2010), *aff'd*, 424 F. App'x 10 (D.C. Cir. 2011) ("Congress added [the limiting language] because of its concern that the receipt of any form of financial assistance might render an employer subject to the commands of Title VI rather than Title VII").  *Compare* 42 U.S.C. § 2000d-3 ("Nothing contained in this subchapter shall be construed to authorize action . . . with respect to any employment practice of any employer . . . except where a primary objective of the Federal financial assistance is to provide

employment.") *with* 42 U.S.C. § 2000e–2(a)(1) (it shall be "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."). As to Awah's claim, *Rogers* is beside the point. Awah pursues the legitimate liability theory that Mansfield Kaseman, a medical facility that receives federal funding, discriminated against him in the provision of medical treatment. Thus, the claim cannot be dismissed on this basis.

Next, Mansfield Kaseman pushes the related argument that the claim fails because no facts make plausible that Awah had been the intended beneficiary of the federal PPP funding. But again, and particularly relevant to Awah's Title VI liability theory, "[t]here is no requirement that a plaintiff plead that he was an intended beneficiary of the federally-funded program in which defendants are alleged to have participated." *Rogers*, 859 F. Supp. at 750 n.7 (quoting *Grimes v. Superior Home Health Care of Middle Tennessee, Inc.*, 929 F. Supp. 1088, 1092 (M.D. Tenn. 1996)); *see also Carnell Const. Corp.*, 745 F.3d at 715 ("Title VI does not require that an injured party be the intended beneficiary of federal funds."). So long as the plaintiff plausibly avers that he had been the victim of intentional discrimination at a medical facility that receives federal funds, the claim survives challenge. *See Carnell Const. Corp.*, 745 F.3d at 716.

Mansfield Kaseman lastly argues that Awah cannot demonstrate he had been the victim of intentional discrimination because the clinic's management had not been placed on notice of its subordinates' discriminatory acts. ECF No. 16-1 at 9 (citing *Rubio ex rel. Z.R. v. Tuner Unified Sch. Dist. No. 20*, 475 F. Supp. 2d 1092 (D. Kan. 2007)). Mansfield Kaseman's position tracks closely with the reasoning of *Gesber v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998). There, the Supreme Court of the United States interpreted a different antidiscrimination

statute, Title IX, to require that liability attaches only where the defendant enacted an official policy of discrimination or knew of the discriminatory acts yet failed to correct them.  *Id.* at 290–91.  The Supreme Court further explained that Title IX and Title VI "operate in the same manner, conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds."  *Id.* at 286.  Because the agreement not to discriminate is between the federal government and the entity receiving federal funds, the Supreme Court held that in the absence of an official policy, liability attaches only where an "appropriate person" with authority to correct the discriminatory conduct has received notice of the discrimination but has failed to take remedial action.  *Id.* at 290.  This Court, accordingly, embraces *Gebser*'s actual knowledge requirement as to the Title VI claim against Mansfield Kaseman.

Viewing the Complaint facts as true and most favorably to Awah, Mansfield Kaseman was on notice of the alleged discrimination, even if the clinic never adopted an official policy of discrimination.  During his care, Awah submitted two formal complaints to Mansfield Kaseman's management and its nursing supervisor.  ECF No. 1 ¶ 12.  In each, Awah detailed the "toxic racist conduct" of the clinic's staff.  *Id.*  Accordingly, when viewed in the light most favorable to Awah, Mansfield Kaseman's notice argument must fail.  The claim, therefore, must proceed against the clinic.[3]

The Title VI claim as to the individual Defendants demands a different result.  Like its statutory counterparts, Title VI permits a cause of action only as to entities, not individuals.  *See Farmer*, 41 F. Supp. 2d at 591 ("Tile VI was designed to prohibit discrimination by

---

[3] Awah avers, without factual support, that the clinic operates pursuant to discriminatory policies, customs, and practices.  *See* ECF No. 1 ¶ 11.  The Court does not ground its decision in this averment which amounts to no more than "legal conclusions couched as facts."  *Wag More Dogs, LLC. v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012).

*organizations* receiving federal assistance.") (emphasis added); *see also Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 421 (4th Cir. 2005) (explaining that Title VI "forbids discrimination by *entities* receiving assistance") (emphasis added); *Whitfield*, 412 F. App'x at 521 ("Individual liability may not be asserted under Title VI."). The claim, therefore, must be dismissed as to the individual Defendants. Further, because no amendment of pleadings could cure this defect, all individual Defendants are dismissed from this claim with prejudice. *See Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 630 (4th Cir. 2008) (affirming district court's dismissal with prejudice when "it [was] clear that amendment would be futile in light of the fundamental deficiencies in plaintiffs' theory of liability"); *see also Forbes v. Ross*, No. 21-0140-PX, 2021 WL 2895836, at *3 (D. Md. July 9, 2021) (dismissing with prejudice a claim that was "truly unamendable").

**B. 42 U.S.C. § 1983 (Count II)**

Count II restates claims of race discrimination but brought pursuant to 42 U.S.C § 1983. "Section 1983 imposes liability on anyone who, acting under color of state law, deprives a person of any 'rights, privileges, or immunities secured by the Constitution and laws.'" *Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204, 210 (4th Cir. 2007) (quoting 42 U.S.C. § 1983). To maintain a § 1983 action, a plaintiff must plausibly allege "that the charged state actor (1) deprived plaintiff of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was performed under color of the referenced sources of state law found in the statute." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

Defendants here are nominally private individuals and entities. They maintain the claim fails because none acted "under color of state law." *See West v. Atkins*, 487 U.S. 42, 43 (1988). Private actors may be sued for a § 1983 violation under three narrow circumstances. First, where

"a 'sufficiently close nexus [exists] between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.'" *Conner v. Donnelly*, 42 F.3d 220, 224 (4th Cir. 1994) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)). Second, where the state has coerced or significantly encouraged the private actor's conduct such that it can be fairly attributed to the state. *Id.* Or third, where "the private entity has exercised powers that are traditionally the exclusive prerogative of the state." *Id.* (quoting *Blum*, 457 U.S. at 1005) (internal quotation marks omitted). The Complaint makes none of these circumstances plausible.

With regard to Mansfield Kaseman, its only conceivable entanglement with the state is that it receives public funding. ECF No. 1 ¶¶ 6–8. But passive receipt of state monies does not transform a private entity into a state actor. *See Mentavlos v. Anderson*, 249 F.3d 301, 319 (4th Cir. 2001) ("[A] private party's dependence upon the state for assistance, even if substantial does not transform its actions into actions of the state . . . .); *A.M. by Cooper v. Va. Council of Churches*, No. RDB-20-00287, 2020 WL 6702999, at *7 (D. Md. Nov. 13, 2020) ("The Plaintiff cannot rely on the receipt of federal funds . . . to establish that [defendants] are state actors for purposes of a Section 1983 claim."). Nor does Awah's conjecture that there could be "structural and contractual relationships between the State and Defendants" save the claim. ECF No. 18 at 7. Because no Complaint facts render the clinic an arm of the state, its claimed misconduct cannot be considered "state action."

Awah, in response, urges that the Court view the Defendants as akin to the private medical contractors at issue in *West v. Atkins*, 487 U.S. 42 (1998). ECF No. 18 at 4–6. There, the Supreme Court considered whether a North Carolina prisoner stated a viable § 1983 claim against a private contract physician who rendered medical care for a prison medical facility.

*West*, 487 U.S. at 43–44.  The Court held that where the state government "bore an affirmative obligation to provide adequate medical care" to inmates and "delegated that function" to a private physician, then the physician's conduct could be "fairly attributable to the State."  *Id.* at 54, 56.  Thus, where the challenged provision of medical services "is traditionally the exclusive prerogative of the state," as in the prison setting, the private medical provider may be considered a state actor.  *Conner*, 42 F.3d at 24; *see also West*, 487 U.S. at 54.

Awah maintains that because Mansfield Kaseman is the "the only health facility available" to him, it retains the same delegated function to provide medical care as the defendant in *West*.  *See* ECF No. 18 at 5.  This argument does not wash.  Neither Mansfield Kaseman nor the individual Defendants were duty bound by law to provide Awah medical care.  *Cf. West*, 487 U.S. at 54–55 (noting that inmates have no choice but to rely on the state for their medical needs).  Awah is instead a private citizen who remained free to choose his medical providers.[4] Thus, even a most charitable reading of the Complaint in its current form does not make plausible that any Defendant was acting under color of state law.  The § 1983 claim is dismissed as to all Defendants, albeit without prejudice.

    **C.**    **42 U.S.C. § 1985 – Civil Conspiracy (Count III) and 42 U.S.C. § 1986 – Neglect to Prevent Conspiracy[5] (Count IV)**

Counts III and IV are premised on Defendant Melara having orchestrated a conspiracy among all Defendants, including Dr. Farnoosh, to violate Awah's civil rights.  *See* ECF No. 1 ¶¶ 61, 73.  To sustain a § 1985 conspiracy claim, a plaintiff must allege facts which make plausible the existence of an agreement between two or more persons "motivated by a specific

---

[4] Maryland's Hospital Patient's Bill of Rights Act, contrary to Awah's assertion, does not obligate the state of Maryland to provide healthcare to the general population.  *See generally* Md. Code Ann., Health-Gen. § 19-342.

[5] Though the Complaint refers to 42 U.S.C. § 1985(3), the correct provision for neglect to prevent a civil conspiracy is in fact 42 U.S.C. § 1986.

class-based, invidiously discriminatory animus" to deprive the plaintiff of a constitutional right. *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995). The Complaint utterly fails to allege any facts supporting such an agreement. No facts, for example, make plausible any contact between Melara and Dr. Farnoosh, let alone conspiratorial agreement. ECF No. 1 ¶¶ 52, 54. Similarly, among the clinic staff, nothing makes plausible the existence of any such "agreement" to violate Awah's rights. Mere conclusory accusations will not suffice. *See, e.g.*, *Borkowski v. Baltimore County*, 414 F. Supp. 3d 788, 803 (D. Md. 2019) ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). Absent such an agreement, the claim necessarily fails. *See Facey v. Dae Sung Corp.*, 992 F. Supp. 2d 536, 541 (D. Md. 2014) (explaining that a conspiracy claim fails where the plaintiff has not demonstrated any agreement or "'meeting of the minds' by defendants").

For the same reasons, the companion "neglect to prevent a conspiracy" claim under § 1986 claim also must be dismissed. A defendant cannot be held liable for neglecting to prevent a conspiracy where no conspiracy has been plausibly averred. *See Sigma Lambda Upsilon/Senoritas Latinas Unidas Sorority, Inc. v. Rector & Visitors of Univ. of Va.*, 503 F. Supp. 3d 433, 449 (W.D. Va. 2020) ("Having determined that the § 1985 claim is subject to dismissal, the court must also dismiss the § 1986 claim against the individual defendants in their personal capacities."). Thus, both claims are dismissed without prejudice as to all Defendants.

### D.      42 U.S.C. § 1981 (Count V)

The Court next turns to Count V, the § 1981 claim. This statute prohibits intentional race-based discrimination in the making and enforcing of contracts. *See* 42 U.S.C. § 1981(a);

14

*Spriggs v. Diamond Auto Glass*, 165 F.3d 1015, 1018 (4th Cir. 1999).  To survive dismissal on this claim, the Complaint must plausibly aver that (1) the plaintiff is a member of a racial minority; (2) the defendant intended to discriminate against plaintiff on the basis of race; and (3) the discrimination concerned the making, performance, modification, and termination of contracts.  *Greene v. YRC, Inc.*, 987 F. Supp. 2d 644, 656 (D. Md. 2013) (citing *Mian v. Donaldson, Lufkin, & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993)).

This claim too cannot survive challenge.  No Complaint facts set forth the existence of any "agreement" between Awah and Defendants such that any alleged discriminatory acts are plausibly related to contractual performance.  No facts make clear what, if any, contract existed between Awah and Defendants; how the parties entered into such a contract; the terms and conditions of the purported contract; or any failures to abide by agreed-upon terms.  Thus, no facts can support that any discriminatory acts occurred in connection with the making or performance of any contract because none is said to exist.  *See, e.g.*, *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (noting that § 1981 has the "specific function" of ensuring that all persons, regardless of race, can make and enforce *contracts*) (emphasis added); *id.* at 480 ("Section 1981 plaintiffs must identify injuries flowing from a racially motivated breach of their own contractual relationship . . . ."); *see also Spriggs*, 165 F.3d at 1018 (noting that the initial inquiry in a § 1981 action focuses on whether the parties entered into a contract).  Wholly devoid of any such factual predicate, the claim fails as a matter of law.[6]

* * *

To summarize the Court's decision regarding Awah's federal civil rights claims: the Title

---

[6] As to Dr. Farnoosh, the § 1981 claim suffers from a more fundamental deficiency.  The only factual predicate for Awah's claims of "race discrimination" against Dr. Farnoosh is that Dr. Farnoosh refused to extract Awah's tooth.  ECF No. 1 ¶¶ 14–15.  But apart from vague, conclusory allegations that Dr. Farnoosh treated other "Latino" patients differently than Awah, no facts make plausible that the delay of treatment was based on

VI claim proceeds as to Mansfield Kaseman and is dismissed with prejudice as to all individual Defendants; and the § 1983, § 1981, and companion conspiracy allegations are dismissed as to all Defendants but without prejudice.  Although the Court finds it highly unlikely that the identified defects in these claims can be cured, Awah will be afforded one opportunity to amend them consistent with this decision.

### E.    Privacy Act of 1974 and the Freedom of Information Act (Count VI)

The Court considers the Privacy Act and Freedom of Information Act claims together because they both suffer from the same fatal flaw.  These statutes reflect "Congressional concern with open *government*, and especially, accessibility to *government* records."  *Greentree v. U.S. Customs Serv.*, 674 F.2d 74, 76 (D.C. Cir. 1982) (emphasis added).  Whereas the Privacy Act allows "individuals on whom information is being compiled and retrieved the opportunity to review the information and request that the agency correct any inaccuracies," *Williams v. ATF*, No. PWG-15-1969, 2017 WL 3978580, at *4 (D. Md. Sept. 8, 2017) (quoting *Blazy v. Tenet*, 194 F.3d 90, 96 (D.C. Cir. 1999)), the Freedom of Information Act allows members of the public to "obtain documents from federal agencies, and grants federal district courts jurisdiction to review agency compliance with citizens' requests," *Reaves v. Jewell*, No. DKC-14-2245, 2014 WL 6698717, at *3 (D. Md. Nov. 26, 2014).  But no Defendant in this case is a federal agency, and no additional facts will transform any of them into federal agencies.  While it is true that the Complaint invokes privacy concerns, neither of these federal privacy statutes afford Awah any remedy.  Thus, the claims fail as a matter of law and are dismissed with prejudice as to all

---

discriminatory animus.  Indeed, no facts make plausible that Dr. Farnoosh treated any other patient who presented with Awah's particular circumstances any differently than he had treated Awah.

Defendants.

**F.      Intentional Infliction of Emotional Distress (Count VII)**

Turning to Awah's state law causes of action, the intentional infliction of emotional

distress ("IIED") claim must be dismissed with prejudice.  In Maryland, IIED claims are

historically "disfavored, difficult to establish and, as such, 'rarely viable.'"  *Lewis-Davis v. Bd. of*

*Educ. of Balt. Cnty.*, No. ELH-20-0423, 2021 WL 4772918, at *18 (D. Md. Oct. 13, 2021)

(quoting *Respess v. Travelers Cas. & Sur. Co. of Am.*, 770 F. Supp. 2d 751, 757 (D. Md. 2011)).

The claim is reserved for those rare circumstances where a defendant's extreme and outrageous

acts cause the plaintiff severe emotional distress.  *See Tavakoli-Nouri v. State*, 139 Md. App.

716, 728 (2001); *see also Savage v. Mayor of Salisbury*, No. CCB-08-3200, 2010 WL 3038953,

at *6 (D. Md. July 30, 2010) (IIED actionable "only for opprobrious behavior that includes truly

outrageous conduct.") (citation omitted).  For the claim to succeed, a plaintiff must aver

sufficient facts to make plausible that "he suffered a severely disabling emotional response to the

defendant's conduct, and that the distress was so severe that no reasonable man could be

expected to endure it."  *Thacker v. City of Hyattsville*, 135 Md. App. 268, 315 (2000) (internal

marks and citation omitted) (emphasis in original).  "[C]onclusory statements of emotional

distress" will not suffice.  *Karn v. PTS of Am., LLC*, No. GJH-16-3261, 2017 WL 4162251, at *5

(D. Md. Sept. 19, 2017).

The claim fails on twin fronts.  First, Defendants' alleged wrongdoing does not constitute

"extreme and outrageous" conduct as the term has been interpreted by Maryland courts.  For the

claim to survive, Defendants must have disregarded entirely Awah's dignity as a human being.

*See, e.g.*, *Hamilton v. Ford Motor Credit Co.*, 66 Md. App. 46, 59 (1986) (To satisfy the extreme

and outrageous element, "conduct must completely violate human dignity."); *Pavlovic v. Univ. of*

*Md. Balt. Cnty.*, No. MJG-13-983, 2013 WL 4775530, at *7 (D. Md. Sept. 4, 2013) (explaining

that "actionable conduct must be truly egregious"); *Arbabi v. Fred Meyers, Inc.*, 205 F. Supp. 2d

462, 466 (D. Md. 2002) (noting that IIED claims have failed even when the plaintiff alleged

"physical invasions of the person of the plaintiff or other truly repugnant intrusions on personal

dignity").  Even if the Court accepts as true that Defendants limited Awah's access to medical

specialists and delayed his tooth extraction on account of his race, this does not "strike to the

very core of one's being, threatening to shatter the frame upon which one's emotional fabric is

hung."  *Hamilton*, 66 Md. App. at 59–60.  Accordingly, Awah's IIED claim fails as to this

essential element.

Alternatively, the claim fails to make plausible that Defendants' conduct caused Awah

*severe* emotional distress such that no reasonable person could be expected to endure it.  *See*

*Strickland v. Carroll County*, No. ELH-11-00622, 2012 WL 401075, at *28 (citing *Lauture v. St.*

*Agnes Hosp.*, No. CCB-08-943, 2009 WL 5166253, at *12 (D. Md. Dec. 29, 2009).  Rather,

Awah maintains he suffered anxiety, insomnia, and other trauma; but nowhere are facts

supporting that this stress was so severe as to thwart his "ability to function on a daily basis."  *Id.*

(quoting *Tackacs v. Fiore*, 473 F. Supp. 2d 647, 652 (D. Md. 2007)); *see also Takacs*, 473 F.

Supp. 2d at 652 (allegations of depression, insomnia, and anxiety insufficient because plaintiff

did not make plausible that she is "unable to function on a daily basis"); *Farasat v. Paulikas*, 32

F. Supp. 2d 244, 247 (D. Md. 1997), *aff'd*, 166 F.3d 1208 (4th Cir. 1998) (dismissing claim

because plaintiff had "done no more than conclusorily allege that he suffered 'severe emotional

distress' and 'mental anguish'").  Because Awah's averred mental distress, while difficult for

him to endure, is not extraordinarily severe, the IIED claim fails as a matter of law.

The Court cannot envision any additional facts which would save this claim.  Thus, it is

dismissed with prejudice.

### G.    Medical Malpractice (Count VIII)

As to Dr. Farnoosh only, Awah pursues a claim for medical malpractice.  ECF No. 1 ¶ 90.  Specifically, Awah avers that Dr. Farnoosh's failure to perform the twice-scheduled tooth extraction constituted a deviation from the applicable standard of care.  *See id.*  In response, Dr. Farnoosh cites Md. Code Ann., Cts. & Jud. Proc. § 3-2a-02, which requires a plaintiff to file a claim with Maryland's Health Care Alternative Dispute Resolution Office as a precondition to suit.  *See* Md. Code Ann., Cts. & Jud. Proc. § 3-2a-02, § 3-2A-06A.  Because the facts as currently alleged do not demonstrate that Awah complied with this administrative requirement, this claim must be dismissed without prejudice.

### H.    "Maryland Code, Title 20, Section 402" (Count IX)

The Court lastly addresses Awah's state statutory claim.  Although the cause of action is not clearly pleaded, it appears to allege a violation of Md. Code Ann., State Gov't § 20-402, which prohibits denial of accommodations or discrimination on the basis of race.  *See* Md. Code Ann., State Gov't § 20-402.  By its terms, however, § 20-402 applies only to those industries and persons regulated by the Maryland Department of Labor.  *Id.* (citing Md. Code Ann., Bus. Reg. § 2-108 (enumerating such specific professions as engineers and accountants)).  Because no Defendant to this action is covered by that statute, *see* Md. Code Ann., Bus. Reg. § 2-108, this claim must be dismissed with prejudice.

### IV.    CONCLUSION

For the above reasons, the Court dismisses all claims save for Count I against Defendant Mansfield Kaseman.  Count I against the individual Defendants, and counts VI, VII, and IX against all Defendants are dismissed with prejudice because no additional facts could

conceivably cure the pleading deficiencies.  As to those claims, Awah will not be permitted to seek amendment.  The remaining claims—counts II, III, IV, V, and VIII—are dismissed without prejudice.  Within 28 days from the date of this Memorandum Opinion and Order, Awah may file an Amended Complaint *as to these claims only*.  If Awah chooses to amend the Complaint and fails again to plausibly state a cause of action, the Court will dismiss any such failed claim with prejudice and without further notice.

A separate Order follows.

December 30, 2021                                                                        /s/
Date                                                                                Paula Xinis
                                                                                    United States District Judge